UNITED STATES of America, Plaintiff,

v.

**German SEDA PEREZ; the Members of the Estate of Luis E. Boothby, and Pedro J. Monzon, Defendants.**

Civ. No. 91–2599 (JAF).

United States District Court,
D. Puerto Rico.

June 23, 1993.

---

448

Silvia Carreño–Coll, Asst. U.S. Atty., Charles E. Fitzwilliam, U.S. Atty., San Juan, PR, for plaintiff.

José Enrique Colón–Santana, San Juan, PR, for defendants.

## OPINION AND ORDER

FUSTE, District Judge.

Plaintiff, United States of America ("the government"), has moved, by amended complaint, for a permanent injunction pursuant to Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and Fed.R.Civ.P. 65, requiring relief against defendants, Ger-

mán Seda Pérez,[1] the Members of the Estate of Luis E. Boothby ("Boothby"), and Pedro J. Monzón ("Monzón"), specifically by: (1) enjoining the defendants from continuing to moor their floating homes in navigable waters of the United States at La Parguera, Lajas, Puerto Rico; (2) ordering the immediate removal of said floating homes from the navigable waters of the United States at La Parguera; (3) permanently enjoining the subsequent return or future permanent mooring or fixing of said floating homes in the waters of La Parguera without first obtaining the necessary permits from the U.S. Army Corps of Engineers ("Army Corps"); and (4) paying the costs of the action and any other relief deemed necessary and proper under the circumstances. For the reasons that follow, the government's complaint is **granted** and permanent injunctive relief is **ordered.**

## Background

La Parguera is a unique, environmentally-sensitive area in the South coast of Puerto Rico. Extensive mangrove forests along the shoreline, offshore mangrove cays, huge meadows of seagrass beds in the bays, along with one of the most extensive coral reef systems in the Caribbean, characterize the area. At La Parguera, Lajas, Puerto Rico, is found one of the world's few bioluminescent bays, which enhances the environmental importance of La Parguera. The environmental sensitivity of the location is based on the presence of endangered species and the peculiar conditions of the mangroves and coastal waters of La Parguera. The areas' Thalassia beds and mangroves are among the most spectacular in Puerto Rico. The health of these ecosystems depends on water clarity and purity. Both the federal and Commonwealth governments have recognized the need to create a protected area. The La Parguera National Marine Sanctuary addresses these needs by ensuring the future conservation of the La Parguera marine and wildlife resources.

---

1. Germán Seda Pérez failed to plead or otherwise defend. His default has been entered. Fed. R.Civ.P. 55.

The National Oceanic and Atmospheric Administration ("NOAA"), the Puerto Rico Department of Natural Resources ("DNR"), the Puerto Rico Planning Board, the U.S. Environmental Protection Agency, the U.S. Department of Agriculture, the U.S. Department of the Interior, the Fish & Wildlife Service, the Army Corps, as well as a number of other federal and state agencies and environmentally-oriented national and local organizations, have expressed their determination to save this environmentally-delicate area and its ecosystems from further damage and destruction caused by destructive use by citizens. All of these agencies have expressed their objection to the presence of floating houses at La Parguera.

The government has consistently claimed that the majority of the floating houses at La Parguera are not houseboats, but floating homes disguised as houseboats, where their intended purpose is not to navigate and move around, but to moor in selected areas, to be used as floating homes.[2] These floating homes are often moored and attached to red mangroves found along the shoreline. Damage to the mangrove trees is evident. Several homeowners have cleared and deposited fill material within the mangrove wetlands and salt flats to provide parking space for their cars and immediate road access to their floating homes. Many floating homes have been found to be discharging raw sewage into the bay waters, degrading the ambient water quality. Others, like the ones under scrutiny here, discharge gray waters from sinks and bathtubs, contributing to the degradation of the waters. The water pollution problems associated with these discharges have an effect beyond the immediate surroundings and also jeopardize delicately-balanced rates of seawater exchange upon which the surrounding areas and the bioluminescent bay depend for survival.

The floating homes have had a negative impact on estuarine resources and vegetation along the shoreline. This vegetation pro-vides valuable benefits to fishery resources, including habitat and nursery areas, production of dead organic matter essential to the estuarine food chain, and filtration of pollutants from the water. The decrease in water quality and the shade created by the permanently-moored floating homes further stress the vegetation and its ability to contribute to the system. Endangered species, such as the yellow-shouldered blackbird, are in such a state of jeopardy that the species may be expected to become extinct. The offshore cays are the last secure nesting area and the continued mooring of some houseboats there account in part for the dwindling population trends leading to the extinction of the species.

The parties are in agreement with the fact that La Parguera is a Natural Resource and is part of the designated Critical Habitat for the blackbird. This led the Army Corps and the Commonwealth of Puerto Rico to enter into a memorandum of understanding dated June 13, 1978, to deal with La Parguera's environmental and ecological problems. The DNR, along with the Army Corps, was in charge of implementing the memorandum of understanding. The purpose of the memorandum of understanding was to inventory all existing shore-based structures, many of which are "grandfathered" under the applicable laws because of the many years which have elapsed since they were built. The memorandum of understanding also established a management plan for the preservation of the environment. It halted the additional construction of stilt houses and geared efforts to prepare and implement a master plan to turn the area into a passive national reserve park. The intention was to open La Parguera for public use, with the necessary controls to prevent future damage to the ecosystems.

The memorandum of understanding expired after twelve years, in 1990. During the period 1978–1990, shore-based construction was halted and the grandfathered stilt hous-

---

2. Some of these floating homes have outboard motors and some kind of steering system. We find that as the Army Corps increased its efforts to get rid of these structures, their owners increased their efforts to install marine appliances and fixtures to give a maritime flavor to the floating homes. Any request by a boat inspector, no matter how ridiculous in the eyes of those with knowledge about the maritime, would be complied with to obtain a houseboat inspection certificate.

es were forced to take a series of measures to avoid damage to La Parguera's ecosystems and waters. However, a new type of construction flourished after 1978. Floating houses, similar to beach cottages, of impressive size and of non-marine configuration, started to appear permanently moored at specific locations.

During the month of October, 1987, the Army Corps inventoried the floating houses and found sixty-three of them at La Parguera. A legal determination was made by the Army Corps that these structures, referred to as houseboats by their owners, were permanently moored obstructions and, therefore, a section 10 permit was required. 33 U.S.C. § 403. Since none of the floating houses had such permit, cease and desist orders were issued by the Army Corps to the owners of the structures.[3]

The record shows that forty-eight owners applied for section 10 "after-the-fact" permits, among them defendants Seda Pérez, Boothby, and Monzón. The permit applications followed the administrative process in which applications were published and responses from federal and state agencies were considered. The views of private groups, ranging from national to local groups, were received. The governmental agencies, both federal and state, opposed the section 10 permits. Forty-one permits were denied, among which were the two at issue here. The Puerto Rico Planning Board and the DNR took a firm position against the issuance of the section 10 permits. The Planning Board was of the opinion that the floating houses and their permanent status in La Parguera was contrary to the Coastal Zone Consistency Management Plan. The Planning Board and the DNR denied consistency certificates. Absent state endorsement, the

Army Corps would not issue the permits, in accordance with 33 C.F.R. §§ 325.2(a)(6) and 325.8(b). See Government Exhibits 21, 23 & 24. The defendants appealed to NOAA the denial of the Coastal Zone Consistency Certificate by the Puerto Rico Planning Board and the DNR. The National Oceanic and Atmospheric Administration affirmed the Puerto Rico Planning Board determination.

On June 5, 1990, the Army Corps notified the defendants that the maintenance of floating houses constituted an illegal activity. The defendants were granted fifteen days to remove their floating houses from La Parguera. Defendants did not seek judicial review from such administrative decision. 5 U.S.C. § 706. The agency action is, for all purposes, final. On December 21, 1991, the government commenced the present action, seeking to implement, through injunctive relief, the Army Corps' final administrative action finding against the owners of the floating homes.[4]

### Discussion

This action, brought to enforce the orders of the Army Corps pursuant to 28 U.S.C. § 1345 and 33 U.S.C. §§ 403, 409, and 413, rests to a large extent on the letter and spirit of section 403, which provides:

The creation of any **obstruction** not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other **structures** in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on

---

3. In January 1988, similar cease and desist orders were entered by DNR. See Government Exhibit 24.

4. The Army Corps has brought this suit to enforce the denial of a permit to allow defendants' floating houses to remain moored in their current locations. 33 C.F.R. § 326.5. Defendants' only defense is that the denial of the permit was an arbitrary and capricious agency action. The defendants' answer and counterclaim are unclear and confused, and all we can take from it is

that the defendants are contesting the Army Corps' enforcement of the denial of the permit. A court may review an Army Corps' decision to deny a permit under section 706 of the Administrative Procedure Act. 5 U.S.C. § 706. The agency's action will only be set aside if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Town of Norfolk v. United States Army Corps of Engineers, 968 F.2d 1438, 1445 (1st Cir.1992).

plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C. § 403 (emphasis added). In turn, 33 C.F.R. § 322.2(b) defines **structures** as follows:

(b) The term **structure** shall include, without limitation, any pier, boat dock, boat ramp, wharf, dolphin, weir, boom, breakwater, bulkhead, revetment, riprap, jetty, artificial island, artificial reef, **permanent mooring structure**, power transmission line, permanently moored floating vessel, piling, aid to navigation, or any other obstacle or obstruction.

33 C.F.R. § 322.2(b) (emphasis added in part).

■ That which is encompassed in the terms "structures and obstructions" is left for the Army Corps to finally define based on their expertise in the management and implementation of the Rivers and Harbors Act. The purpose behind 33 U.S.C. § 403 is to ban from the navigable waters all obstructions not affirmatively authorized by Congress and to forbid the placement of undesirable structures in the navigable waters, except as recommended by the Chief of Engineers and authorized by the Secretary of the Army. The Act allows the Secretary wide discretion

in deciding whether to issue a permit. In fact, it places no restrictions on the decision at all. *Di Vosta Rentals, Inc. v. Lee,* 488 F.2d 674 (5th Cir.), *cert. denied,* 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1973).

■ Where, as here, the Army Corps' decision was not the object of prompt judicial review as allowed by law, *Di Vosta,* 488 F.2d at 677, this court, as an enforcing tribunal, is more constrained than a court of justice in the case of a petition by an affected party seeking direct review of an adverse administrative action. *Di Vosta,* 488 F.2d at 678. The legality of the administrative decision having been established by such administrative action, which the affected parties elected not to seek review of, our role in enforcing such administrative decision is limited to determining that said decision is legally enforceable by a federal court. In the process of enforcing the administrative decision, we, as a matter of equity, only indirectly afford the defendants the judicial review of the adverse administrative action which they elected not to pursue. 5 U.S.C. § 706.[5] Of course, the terms of the injunctive remedy are for us to craft. *See Blake v. United States,* 295 F.2d 91, 98 (4th Cir.1961).

■ The Army Corps found the floating houses in question to be permanently-moored structures and obstructions in the navigable waters. Since we find that such decision was not arbitrary, capricious or an abuse of discretion, that final administrative decision binds us in our role as enforcing court. In addition, based on our independent analysis at trial, we find that the agency properly found that the three houseboats in question are properly floating homes and that the defendants' intended purpose is to have them permanently moored as home structures at

---

5. There is nothing that has been brought before this court to suggest that the agency's decision was arbitrary, capricious or an abuse of discretion. We find that the agency properly determined that the three houseboats in question were floating homes, and that the defendants' intended purpose was to have them permanently moored at La Parguera. Indeed, the tardiness of the defendants in raising any objection to the denial of the suit suggests that they also realized their protest was futile. In performing a review of an agency decision, the court generally constrains itself to the record that was before the agency

when it made the decision. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Valley Citizens for a Safe Environment v. Aldridge,* 886 F.2d 458, 460 (1st Cir. 1989). Although the defendants have not presented to us the complete administrative record, the agency's portions of the record presented by the government clearly establish that the structures in question are permanently-moored structures within the meaning of the statute. Nor is there any question that the agency decision is otherwise not in accordance with law.

La Parguera. The fact that the owners call them boats is inconsequential. Nor is it important that the Department of Natural Resources of Puerto Rico has registered and inspected them as houseboats.

Considering our own assessment of the structures, *see* Government's Exhibit 39, homes identified with Nos. 20 (Monzón), 24 (Seda Pérez), and 41 (Boothby), along with the observations made at trial by the court-appointed expert, Capt. Paul W. Simpson, Fed.R.Evid. 706, the inescapable conclusion is that the structures in controversy are wooden beach homes—beach cottages sitting on top of pontoons to give them some maritime flavor in the hope that the easily-obtained DNR boat sticker and inspection will tempt the trier of facts to define them as houseboats or structures intended to navigate and not as structures intended to be permanently moored. The capacity to navigate is not the only factor to be considered in a section 10, 33 U.S.C. § 403, analysis. Such capability is only one of the factors to be considered. It is not determinative. 33 C.F.R. § 320.4.[6]

### Conclusion

The final answer rests on the intention behind the use of a structure by its owner. The findings made by the Army Corps clearly support the legality of the decision. The same is not contrary to law. While the structure may be a vessel, 1 U.S.C. § 3, such structure, when configured and used as a floating home or beach cottage, is not intend-ed for navigation. The independent evidence received by us at trial confirms that the floating homes in question are intended to be as permanently moored as governmental agencies will allow them to be. Their seaworthiness is doubtful, to say the least, and, although capable of movement in the water, the record strongly suggests that their intended purpose is that of permanently-moored structures only moved or navigated in protected waters for two to three-mile distances on sporadic occasions, to make a record of mobility in order to substantiate a defense to the Army Corps' request for injunctive relief.[7] *See United States v. Boyden*, 696 F.2d 685 (9th Cir.1983); *United States v. Oak Beach Inn Corp.*, 744 F.Supp. 439 (S.D.N.Y.1990). In addition, this court finds the floating structures to be obstructions to navigation. The Army Corps so intimated in its cease and desist orders. Therefore, even if the government had not demonstrated, as it did, that the vessels were permanently-moored structures, they, nonetheless, constitute obstructions to the navigable capacity of La Parguera waterways and, thus, violate section 10, 33 U.S.C. § 403. *Oak Beach*, 744 F.Supp. at 443.

### Remedy

The defendants, Germán Seda Pérez, the members of the Estate of Luis E. Boothby, and Pedro J. Monzón, are **ENJOINED** from continued mooring of their floating homes or houseboats in the navigable waters of the

---

6. Recreational vessels are vessels of the United States subject to numbering and identification, as well as to state laws enacted in compliance with the Uniform Federal Legislation. *See* 46 U.S.C. §§ 12301–13110. Puerto Rico participates in the Federal Recreational Boating Program and has elected to enact its own legislation consistent with federal law. *See* Law No. 48, of June 27, 1986, 12 L.P.R.A. §§ 1391–1397c. Chapter V, 12 L.P.R.A. §§ 1395–1395h, provides for registration and numbering of vessels.

Defendants make the argument that since their houseboats have been identified and registered with the Commissioner of Navigation, DNR, as required by federal and state law, such registration is evidence of the fact that the floating homes are houseboats and not permanently-moored structures. The answer to such argument is that a vessel or a bona-fide houseboat can become an obstruction to navigation or a permanently-moored structure, in violation of 33 U.S.C. § 403, if the boat owner's intention is to permanently moor the same or allow it to be an obstruction. As a matter of fact, the Puerto Rico Regulation approved under Law No. 48 so confirms. *See* 12 Rules & Regulations—Rules & Regulations, Law No. 48 § 2(8) (definition of houseboat); *see also* § 26(14), Traffic Rules specifically prohibiting permanent mooring (more than ten days) in a National Reserve area, such as La Parguera.

7. The evidence confirms a pattern of activity that points to permanency and not to mobility. The floating houses have the capacity of being connected to electricity and water from land. There is evidence of long periods of permanent mooring at specific places. While moored for long periods of time, they have shaded seagrass, reducing photosynthesis and grass productivity.

United States at La Parguera, Lajas, Puerto Rico. The defendants are **ORDERED** to remove said structures from the mentioned area **on or before July 15, 1993,** under penalty of severe sanctions, including civil contempt for failure to obey this order. The removal will be at defendants' cost. No extensions will be entertained. The defendants are **PERMANENTLY ENJOINED** from future permanent mooring at the designated areas and from future mooring in violation of Law No. 48 and its regulations, 12 L.P.R.A. §§ 1391–1397e, regulation, § 26(14), and without obtaining the necessary permit from the Army Corps under 33 U.S.C. § 403. The defendants will pay the costs of this action.

**IT IS SO ORDERED.**