**UNITED STATES of America, Plaintiff,**

**v.**

**Pablo HERNANDEZ, et al., Defendants.**

**Civil No. 94–1846(HL).**

United States District Court, D.Puerto Rico.

Sept. 3, 1997.

Isabel Munoz–Acosta, U.S. Attys. Office Dist. of P.R., Civil Div., Hato Rey, PR, Silvia L. Carreno–Coll, U.S. Attys. Office Dist. of P.R., Criminal Div., Hato Rey, PR, for U.S.

Daniel F. Lopez–Romo, Daniel Ricardo Lopez–Gonzalez, Hato Rey, PR, for Pablo Hernandez.

Daniel Ricardo Lopez–Gonzalez, Hato Rey, PR, for Jorge E. Rodriguez, Isabel Witte–Hoffman, Wilfred Flores, Norberto Montilla, Flor Marina Vazquez–Diaz, Dwight Santiago, Juan Farinacci, Demetrio Amador, Sylvia Orriola.

Gustavo A. Del–Toro–Bermudez, San Juan, PR, for Rene Irizarry–Aymat, Mariano Ortiz, Saul Lugo, Ana M. Irizarry.

Eldia M. Diaz–Olmo, Hato Rey, PR, for Roberto Villamil–Sordo.

Enrique Alcaraz–Micheli, Mayaguez, PR, for Jose Ramon Juelle.

Mario M. Quintero–Nadal, Mayaguez, PR, for Carlos Frontera–Colley.

Jose E. Colon–Santana, Hato Rey, PR, for Rafael Camacho.

## OPINION AND ORDER

LAFFITTE, District Judge.

The United States of America brings this class action pursuant to 33 U.S.C. §§ 403 and 409. It seeks injunctive relief to compel Defendants, owners of houseboats or "floating structures" in the La Parguera area of Lajas, Puerto Rico, to remove their house-

boats from La Parguera. In an order dated September 20, 1995, the Court granted the Government's request to certify this case as a class action and divided the defendant class into a Subclass A and a Subclass B.[1] Subclass A is made up of all present and future owners of houseboats in La Parguera who are members of the Asociación de Dueños de Casas Bote de La Parguera ("the Asociación").[2] Subclass B is made up of all present and future owners of La Parguera houseboats who are not members of the Asociación. In an order dated January 22, 1997, the Court granted Subclass A representative Sylvia Orriola leave to represent a subgroup consisting of herself, Jorge Rodríguez, Wilfred Flores, Norberto Montilla, Flor Marina Vázquez Díaz, Dwight Santiago, and Juan Farinacci.[3]

The Court held a six-day bench trial on the Government's claims against all of Subclass A and against the following individual members of Subclass B: Rafael Camacho, Raúl Nazario, Ana M. Irizarry, Mariano Ortíz, Betsy Ortíz, Saúl Lugo, and Milagros Lugo. All members of Subclass A and the individual members of Subclass B testified.[4] The parties have submitted their post-trial briefs, and the Court is now ready to rule.

### FINDINGS OF FACT

Based on all the evidence and testimony presented at trial, the Court makes the following findings of fact:

1. The waters of La Parguera are navigable waters of the United States. La Parguera is a natural reserve of Puerto Rico. It consists of mangrove forests along the shoreline, a series of offshore cays, and bays with an extensive coral reef system. The area is one of several habitats for the yellow-shouldered blackbird, which is an endangered species.[5]

2. In January 1988, the United States Army Corps of Engineers ("ACOE") sent cease and desist orders to the houseboat owners of La Parguera. The cease and desist orders informed each owner that an inspection of La Parguera indicated that he or she was the owner of a permanently moored houseboat or floating structure which did not have a permit to moor in La Parguera. The order stated in part,

> You are hereby notified to cease and desist from all activities that are in violation of the current laws and regulations to include use and continued improvements and modifications to the structure or structures and facilities for which no permit has been obtained.

The order stated that each owner had the right to submit an after-the-fact application for a permit to moor in La Parguera. The order also explained that pursuant to this process, the ACOE would solicit comments on the application from federal and Puerto Rico agencies, and a public review on the permit application would be held. The order also stated that if the application were to be denied, the owner could be required to remove the houseboat and restore the area to its original natural condition.[6]

2. Forty-eight houseboat owners from La Parguera then submitted after-the-fact applications to the ACOE for permits to moor in

---

1. Docket no. 21.

2. The following are currently members of the Asociación: Sylvia Orriola, Lucy Rodríguez, Lolín Paz, Carlos González, Nelson Mercado Luciano, Jorge Rodríguez, Wilfred Flores, Norberto Montilla, Edwin Sambolín, Barlaam Quiñones, Juan Farinacci, Isabel Witte Hoffman, Ivonne Lucero, Demetrio Amador, Dwight Santiago, Pablo Hernández, and Flor Marina Vázquez Díaz.

3. Docket no. 129.

4. Isabel Witte Hoffman, a member of Subclass A, was not able to testify, but her son Pablo Hernández testified regarding her houseboat. Hernández is also a class representative. Additionally, Subclass A member Edwin Sambolín was unable to testify. It was stipulated that his testimony would have been substantially the same as the testimony of the other Subclass A members.

5. Docket no. 150. Counsel for Raúl Nazario, Ana M. Irizarry, Mariano Ortíz, Betsy Ortíz, Saúl Lugo, and Milagros Lugo did not sign the parties' "Joint Statement of Uncontested Facts" filed on February 14, 1997. At trial, these individuals did not object to this statement of uncontested facts. Accordingly, the Court treats their lack of objection as a tacit stipulation to the facts contained therein.

6. *See, e.g.,* exhibit 1A.

La Parguera. As part of the application process, the ACOE asked other public agencies for comments on the applications. The United States Fish and Wildlife Service, the Environmental Protection Agency, and the National Marine Fishery Service all objected to the presence of houseboats in La Parguera. The Fish and Wildlife Service issued a biological opinion on the impact that the houseboats would have on the yellow-shouldered blackbird. The opinion stated that the offshore cays of La Parguera provided one of the last secure nesting areas for the birds; that the houseboats in La Parguera would have a negative impact on the ability of the bird to nest in the area; and that the issuance of after-the-fact permits was likely to jeopardize the continued existence of the bird. Additionally, the Puerto Rico Planning Board submitted a certificate stating that the houseboats were not consistent with Puerto Rico's coastal zone management program and that the Board considered the houseboats to be illegal structures.

The ACOE also conducted in 1989 an on-site inspection of the houseboats as part of the evaluation process for the after-the-fact permit applications. The inspection was done by two ACOE employees and two employees of the Fish and Wildlife Service. The inspection team considered such factors as the intended use of the houseboat; whether the houseboats had adequate motor mounts, navigational lights, or other accouterments of navigation; whether the houseboat was capable of being safely navigated; whether the houseboat actually navigated around the area; the means by which the houseboats were moored; the type of water or electrical connections that the houseboat might have had; and the condition of the houseboat and its pontoons.[7]

The ACOE denied forty-one applications. In a letter sent April 1990 to the denied applicants, the ACOE informed each owner that the rejected houseboats were not deemed to be capable of safe navigation; that the Puerto Rico Planning Board found that the houseboats were not consistent with the coastal zone management plan; that the Fish and Wildlife Service concluded that the houseboats threatened the yellow-shouldered blackbird; and that therefore the application for an after-the-fact permit was denied. The letter also informed the owner that the decision could be appealed to the Office of Ocean and Coastal Resource Management in Washington, D.C.[8] On June 5, 1990, the ACOE sent the houseboat owners a final order stating that the after-the-fact permit application had been denied and that therefore the houseboats had to be removed within 15 days.[9]

The other seven owners received letters in April 1990 stating that the ACOE had thoroughly reviewed their floating structures; that their floating structures had been found to be either a temporarily moored vessel or a vessel moored in a permitted marina; that the ACOE did not have jurisdiction over such floating structures; and that therefore the cease and desist order was rescinded.[10] The letter further cautioned that if in the future the owner "plan[ned] to change the purpose of [the] boat to that of a permanently moored vessel," it would be necessary to apply for a permit.

3. Saúl Lugo of Subclass B and all the houseboats of Subclass A have boat licenses from the Puerto Rico Department of Natural Resources. The members of Subclass A have also passed a boat inspection administered by members of the United States Coast Guard auxiliary.

4. In 1991, the Government filed suit against four houseboat owners and sought to permanently enjoin them from mooring their houseboats in La Parguera. See United States v. Seda Perez, 825 F.Supp. 447 (D.P.R. 1993). The district court granted the Government the relief it sought and ordered the owners to remove their houseboats from La Parguera. See id. at 452–53. Two of the owners appealed, and the First Circuit affirmed the decision. See United States v. Estate of Boothby, 16 F.3d 19 (1st Cir.1994).

7. Joint exhibit I; testimony of Marie Grigsby Burns.

8. See, e.g., exhibit 3.

9. See, e.g., exhibit 3.

10. See, e.g., exhibit 2

In July 1993, after the district court ruled for the Government in the *Seda Perez* case, the ACOE sent letters to all houseboat owners, including those that had received no-permit-required letters. The letters referred to the district court's decision and invited the owners to remove their houseboats from La Parguera. The owners declined the invitation, and the Government brought the present action. None of the houseboat owners presently before the Court have ever received section 10 permits from the ACOE to moor in La Parguera.

5. The houseboats of La Parguera are built on pontoons. As the Government's expert on marine surveys testified, the houseboats were built of wood with construction techniques in the frame, floor, and walls that are normally used on houses. The Court finds this expert's testimony to be highly credible. The high, square, house-like construction of the houseboats gives them less maneuverability and more wind resistance than are found in conventional vessels. Their design indicates that they were not intended to be able to move easily through the water. The houseboats are capable of moving around the shallow, calm reef-protected waters of La Parguera.[11] However, they are not able—nor are they intended—to safely navigate beyond the waters of La Parguera.[12]

The Court further finds that the intended use of the houseboats is recreational in nature. They are able to move about the waters of La Parguera, and many of the owners testified that their houseboats were intended for navigation. Notwithstanding this testimony, however, the Court finds that the houseboats' principal purpose is not as a means of transportation. The Court further finds that, based on the testimony of the ACOE team that conducted the 1989 survey, the testimony of the Government's marine survey expert, and the testimony of the houseboat owners themselves, the principal purpose of the houseboats is as a weekend or vacation home. Lastly, based on the testimony of the houseboat owners and the rec-

ord as a whole, the Court finds that the owners adopted maritime accouterments, such as log books and single-point moorings which may be quickly cast off, in order to give their houseboats a boat-like flavor and to circumvent the ACOE's asserted jurisdiction over them.

## APPLICABLE LAW

The Government alleges that all Defendants' houseboats are structures, that the owners do not have permits to moor their structures in La Parguera, and that therefore they are in violation of section 10 of the Rivers and Harbors Appropriation Act of 1899 ("the RHA"), 33 U.S.C. § 403. Section 10 of the RHA provides as follows:

**Obstruction of navigable waters generally; wharves; piers, etc; excavations and filling in**

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.

33 U.S.C.A. § 403 (West 1986). The relevant regulations define "structure" as follows:

---

11. The owners presented videos and photographs which demonstrated that the houseboats could navigate in the waters of La Parguera.

12. Exhibit 21; testimony of Paul Simpson.

The term *structure* shall include, without limitation, any pier, boat dock, boat ramp, wharf, dolphin, weir, boom, breakwater, bulkhead, revetment, riprap, jetty, artificial island, artificial reef, permanent mooring structure, power transmission line, permanently moored floating vessel, piling, aid to navigation, or any other obstacle or obstruction.

33 C.F.R. § 322.2(b) (1996). The RHA was enacted to preserve and protect the country's navigable waterways. *United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655, 663, 93 S.Ct. 1804, 1811, 36 L.Ed.2d 567 (1973); *United States v. Lambert*, 915 F.Supp. 797, 803 (S.D.W.Va.1996). It grants the ACOE broad discretion over these waterways. *United States v. Alameda Gateway, Ltd.*, 953 F.Supp. 1106, 1110 (N.D.Cal.1996). Section 10 is intended to prevent obstructions of the navigable capacity in the United States' waterways. *United States v. Cumberland Farms of Connecticut, Inc.*, 826 F.2d 1151, 1158 (1st Cir.1987); *United States v. Boyden*, 696 F.2d 685, 687 (9th Cir.1983); *Lambert*, 915 F.Supp. at 803. This section has also become an instrument for the enforcement of environmental policy. *Boothby*, 16 F.3d at 23; *Cumberland Farms*, 826 F.2d at 1158.

■■■ Section 10 has three clauses. The first clause prohibits the creation of any obstruction to the navigable capacity of the United States waters. *See* 33 U.S.C.A. § 403; *Boyden*, 696 F.2d at 687; *United States v. Oak Beach Inn Corp.*, 744 F.Supp. 439, 443 (S.D.N.Y.1990). The second clause lists things that may be built in the United States waterways only with authorization from the ACOE. *Lambert*, 915 F.Supp. at 803; *Oak Beach Inn*, 744 F.Supp. at 443. The list in the second clause ends with the catch-all phrase "other structures." *See* 33 U.S.C.A. § 403. The items included in the second clause are presumed to be obstructions. *Boothby*, 16 F.3d at 21; *Boyden*, 696 F.2d at 687; *Oak Beach Inn*, 744 F.Supp. at 443. Ultimately, what constitutes a structure or an obstruction is for the ACOE to define. *Seda Perez*, 825 F.Supp. at 451. The ACOE has broad discretion on whether to issue Section 10 permits. *Boothby*, 16 F.3d at 23; *Di Vosta Rentals, Inc. v. Lee*, 488 F.2d 674,

677 (5th Cir.1973). In fact, neither the RHA nor its regulations put restrictions on the ACOE in its decision on whether to issue a permit. *Di Vosta*, 488 F.2d at 677; *Seda Perez*, 825 F.Supp. at 451. The second clause of section 10, along with its defining regulation at 33 C.F.R. § 322.2(b), may lawfully be applied to houseboats that constitute permanently moored vessels. *Boothby*, 16 F.3d at 21; *Boyden*, 696 F.2d at 687–89; *Great American Ins. Co. v. Tugs "Cissi Reinauer,"* 933 F.Supp. 1205, 1219 (S.D.N.Y. 1996); *Seda Perez*, 825 F.Supp. at 451–52.

■■■ In the case before the Court, the ACOE determined that the houseboats in La Parguera were permanently moored floating vessels. The Court's standard of review of an ACOE decision is limited to a determination of whether it was arbitrary or capricious. *National Wildlife Federation v. Whistler*, 27 F.3d 1341, 1344 (8th Cir.1994) (ACOE issued a permit pursuant to the Clean Water Act); *Boothby*, 16 F.3d at 21; *Town of Norfolk v. United States Army Corps of Engineers*, 968 F.2d 1438, 1445 (1st Cir.1992); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir.1983); *Di Vosta*, 488 F.2d at 679–80; *Northwest Sea Farms v. United States Army Corps of Engineers*, 931 F.Supp. 1515, 1519 (W.D.Wash.1996). When a court reviews an agency decision under the arbitrary and capricious standard, it must determine "whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. v. Natural Resources Defense Council*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983). If the agency considered the relevant factors and if the agency did not make a clear error of judgment, then the decision was not arbitrary or capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273, 1285 (1st Cir.1996). An agency decision would be arbitrary and capricious if, for example, the agency did not rely on factors which Congress intended it to consider; failed completely to consider an important element of the issue; or presented an expla-

nation for its decision that is counter to the evidence that was before it or that is so implausible that it could not be attributed to a difference in view. *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867. The reviewing court may not compensate for agency deficiencies; it may not provide a basis for the agency's decision that the agency itself did not give. *Id.* Although this standard of review is a narrow one, the court must make a thorough review and a careful inquiry into the record. *Dubois*, 102 F.3d at 1285. An agency decision will pass muster if the court determines that the decision makes sense. *Id.*

The question of whether a houseboat constitutes a permanently moored floating vessel is fact-sensitive. *Boothby*, 16 F.3d at 22; *Cissi Reinauer*, 933 F.Supp. at 1219. The factors that the ACOE may consider include the houseboat's environmental impact, *see Boothby*, 16 F.3d at 23; its construction technique, *see Seda Perez*, 825 F.Supp. at 452; and its intended use, *see Boothby*, 16 F.3d at 23; *Cissi Reinauer*, 933 F.Supp. at 1219. The houseboat's ability to navigate may also be a factor in the determination. However, "[n]avigability does not have the same meaning for all purposes." *Boothby*, 16 F.3d at 22. A houseboat's ability to navigate is not, by itself, determinative of the issue. *Seda Perez*, 825 F.Supp. at 452. Moreover, the fact that a houseboat may qualify as a vessel under another section of the United States Code is not dispositive of whether the houseboat may be a permanently moored floating vessel under section 10 of the RHA. *See Boyden*, 696 F.2d at 687. Additionally, a boating license from a local agency such as the Puerto Rico Department of Natural Resources will by itself be insufficient to demonstrate whether a houseboat is covered by section 10. *See Boothby*, 16 F.3d at 22–23.

In the case before the Court, it is clear that the houseboats are able to navigate around the waters of La Parguera. This ability to make trips around the bay, however, is not sufficient to establish that a houseboat is not a permanently moored floating vessel. *See Boothby*, 16 F.3d at 23; *Seda Perez*, 825 F.Supp. at 452. As discussed above, the Court has found that the house-

boats' square, house-like construction techniques give them a large degree of wind resistance; that their design makes them hydrodynamically inefficient and limits their navigability and maneuverability; and that they are primarily intended not as a means of transportation, but as a weekend or vacation home. In other words, although the houseboats may be characterized as vessels, they are not primarily intended for navigation; they are intended to be vacation homes which can be moved. Their navigational ability is limited. This lends support to the ACOE's decision that the houseboats qualify as permanently moored floating vessels which require a section 10 permit. As discussed above, the RHA gives the ACOE broad discretion over United States waterways. *Alameda Gateway*, 953 F.Supp. at 1110. The ACOE considered the intended use, navigability, and construction of the houseboats. These are all relevant factors, and it is not apparent that the ACOE made a clear error of judgment in its consideration. There is a rational connection between the facts found and the decision that the houseboats are permanently moored floating vessels. *See Baltimore Gas & Elec.*, 462 U.S. at 105, 103 S.Ct. at 2256.

Moreover, the environmental impact of the houseboats provides further support for the ACOE's decision. As mentioned above, the RHA is an instrument for the enforcement of environmental policy. *See Boothby*, 16 F.3d at 23; *Cumberland Farms*, 826 F.2d at 1158. The ACOE was well within its purview in considering environmental factors. *See* 33 C.F.R. § 320.4(a)(1) (General environmental concern is a relevant factor in the decision whether to issue a permit). During the after-the-fact permit application process, the ACOE solicited comments from other public agencies. *See id* § 320.4(c). The United States Fish and Wildlife Service, the Environmental Protection Agency, and the National Marine Fishery Service all objected to the presence of the houseboats because of their environmental impact on La Parguera. The Fish and Wildlife Service issued a biological opinion that the houseboats were likely to jeopardize the survival of the yellow-shouldered blackbird. *See id.* § 320.3(i)

(Federal agencies must consult Fish and Wildlife Service to determine whether an agency action is likely to jeopardize an endangered species). Additionally, the Puerto Rico Planning Board certified that the houseboats were not consistent with Puerto Rico's coastal zone management program. A permit may not be issued to an applicant unless the appropriate state agency certifies that the applicant's activity complies with the coastal zone management program. *Id.* § 320.4(h); *see id.* § 326.3(e)(1)(iii) (An after-the-fact permit must be denied when a federal, state, or local agency has already denied a certificate or authorization to the applicant). The ACOE was justified in considering these environmental factors. In fact, it was legally obligated to do so. Because the consideration of the environmental impact of the houseboats—as well as the issues of intended use, navigability, and construction—was proper, the Court cannot hold that the ACOE's reliance on these factors in making its decision was arbitrary and capricious.

The Court acknowledges that at trial the owners submitted credible expert testimony to support their arguments. For example, Subclass A's environmental experts, James Spotila and Maximo Cerame Vivas, testified that the Subclass A houseboats did not have a negative effect on the yellow-shouldered blackbird or the sea grasses which grow in La Parguera.[13] Additionally, Subclass A's navigation expert, Augusto Villalon, testified that the houseboats were navigable and were not permanently moored. The Court also acknowledges that some houseboat owners— particularly the members of Subclass A— have implemented sound environmental practices such as the use of single-point moorings and a dinghy which collects the houseboats' sewage waste and safely disposes of it on shore.

The weight of Subclass A's expert evidence and environmental practices is tempered, however, by the Court's standard of review. If the Court had been sitting as the court of first instance to determine whether the houseboats were permanently moored floating vessels, the outcome here might have been different. Instead, this Court is limited in its review to determine whether the ACOE's decision was arbitrary and capricious. This is a narrow standard of review, and the RHA gives the ACOE broad discretion. This narrow standard of review and the evidence which the ACOE relied on compel the Court to conclude that the ACOE's determination that the houseboats were permanently moored floating vessels and the ACOE's decision to deny them section 10 permits were not arbitrary and capricious.

■ Lastly, some of the owners claim that because they acquired their houseboats after the application proceedings in 1988–90, they have been denied their due process rights. The owners who received the no-permit-required letter in 1990 make similar arguments. The Court does not find these arguments to be persuasive. The seven no-permit-required owners received letters in 1990 stating only that they did not need permits. These seven owners were informed by a letter in July 1993 that if they did not remove their houseboats from La Parguera they would be subject to a lawsuit to have them removed. No houseboat owner has a permit to moor in La Parguera. Section 10 makes it unlawful to moor a structure in navigable waters of the United States without a permit from the ACOE. 33 U.S.C.A. § 403; 33 C.F.R. § 322.3(a). The Court today holds that the ACOE's decision that the houseboats were permanently moored floating vessels was not arbitrary and capricious. Thus, the houseboats are in violation of section 10 of the RHA. Regardless of what administrative procedures have already been taken, regardless of when each owner acquired his or her structure, and regardless of whether the owner received a no-permit-required letter, no houseboat owner has a permit to moor in La Parguera.

■ Some owners claim that they have been denied their right to a hearing. Section 10 does not, however, require that the ACOE hold a hearing before it makes a determination. *Taylor v. District Engineer, United States Army Corps of Engineers,* 567 F.2d 1332, 1336 (5th Cir.1978); *Nofelco Realty Corp. v. United States,* 521 F.Supp. 458,

13. Docket nos. 181–183.

461 (S.D.N.Y.1981). The administrative regulations do not require that every applicant receive a hearing; rather, a public hearing should be held only when needed for making a decision. *See* 33 C.F.R. § 327.4(a). Moreover, the ACOE may deny a permit without public notice or other procedural steps where, as here, a state agency has already denied the applicant a permit. *See id.* § 325.8(b).

 The no-permit required owners argue that they have never been issued cease and desist orders. If the alleged violation involves a completed project, the ACOE need not issue a cease and desist order. *Id.* § 326.3(c)(2). The ACOE does have the obligation of notifying the responsible party of its violation. *Id.* In 1993, the ACOE sent the seven no-permit-required owners letters advising them that they would be sued if they did not remove their houseboats from La Parguera. Thus, they have received notice of their alleged violations.

WHEREFORE, the Court hereby grants the Government's request for injunctive relief. The Court hereby **orders** the following defendants, their agents, and their successors to remove their houseboats from La Parguera by **November 1, 1997,** and the Court **enjoins** the following defendants, their agents, and their successors from mooring their houseboats in the navigable waters of the United States at La Parguera, Lajas, Puerto Rico until they obtain a permit from the United States Army Corps of Engineers to do so:

(1) The members of Subclass A. That is, all present and future owners of houseboats in La Parguera who are members of the Asociacíon de Dueños de Casas Bote de La Parguera, including Sylvia Orriola, Lucy Rodríguez, Lolin Paz, Carlos González, Nelson Mercado Luciano, Jorge Rodríguez, Wilfred Flores, Norberto Montilla, Edwin Sambolín, Barlaam Quiñones, Juan Farinacci, Isabel Witte Hoffman, Ivonne

Lucero, Demetrio Amador, Dwight Santiago, Pablo Hernández, and Flor Marina Vázquez Díaz.

(2) The individual members of Subclass B who appeared at the bench trial. That is, Rafael Camacho, Raúl Nazario, Ana M. Irizarry, Mariano Ortíz, Betsy Ortíz, Saúl Lugo, and Milagros Lugo.[14]

**IT IS SO ORDERED.**

---

14. The Government also seeks the removal of houseboats owned by the remaining members of Subclass B. A number of these owners have objected to the consent decree entered into between the Government and Subclass B. The Court today is ordering these objecting owners to show cause why they should not be forced to comply with the consent decree and remove their houseboats from La Parguera.