**WATER KEEPER ALLIANCE,
et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF
DEFENSE, et al., Defendants.**

CIV. No. 00–2295(HL).

United States District Court,
D. Puerto Rico.

June 9, 2001.

Celina Romany Siaca, Maria L. Jiminez-Colon, Jose Pagan-Nieves, San Juan, PR, for plaintiffs.

Isabel Munoz-Acosta, U.S. Attorney's Office, District of P.R., Civil Division, Hato Rey, PR, Wayne D. Hettenbach, Eileen T. McDonough, Marc Swartz, Washington, DC, for defendants.

Miguel A. Fernandez-Torres, U.S. Attorney's Office, District of P.R., Civil Division, Hato Rey, PR, for Donald H. Rumsfeld, Robert B. Pirie and Gail Norton.

### *OPINION AND ORDER*

LAFFITTE, Chief Judge.

Before the Court is Plaintiffs' Motion for Preliminary Injunction, Dkt. No. 1. Defendants have filed oppositions, Dkt. Nos. 5 & 12, and Plaintiffs have replied, Dkt. No. 16. This lawsuit presents a claim under the Resource Conservation and Recovery Act, a claim under the Endangered Species Act ("ESA") for violation of certain "consultation requirements," a claim under the ESA for "illegal takings" of listed species, and a claim for denial of equal protection of the laws. Plaintiffs request a preliminary injunction to stop the Navy's training exercises on the island of Vieques solely on the basis of their claim for violation of the ESA's consultation requirements.

Both parties have agreed to have the motion for a preliminary injunction adjudicated on the papers and without a hearing. This adjudication is only preliminary in nature, however, and must be distinguished from the Court's eventual ruling on the merits of this case. The Court has examined the parties' memoranda, and it is now ready to rule on Plaintiffs' request for

a preliminary injunction.[1]

## Background

On October 10, 2000, Plaintiffs filed this lawsuit, requesting a temporary restraining order to stop Defendants' training exercises on the island of Vieques. On October 11, 2000 the Court denied Plaintiffs' request for a temporary restraining order.[2] On November 9, 2000, the Court convened a status conference. The Court ordered Plaintiffs to amend their complaint to eliminate all irrelevant and/or inflammatory allegations and to delete from the caption of the case those plaintiffs lacking standing. The Court allowed Plaintiffs until December 11, 2000 to comply.

After Plaintiffs submitted an amended complaint that failed to comply fully with the Court's directive, the Court dismissed Plaintiffs Health and Human Services Union and Fellowship for Reconciliation from this case for lack of standing on January 16, 2001. Additionally, the Court, on January 17, 2001, ordered some of Plaintiffs to show cause by February 16, 2001 why certain claims should not be dismissed for lack of standing. On January 23, 2001, the Court also ordered Plaintiffs to remedy their non-compliance with the Court's previous order to delete all irrelevant and/or inflammatory allegations by February 23, 2001. This order noted that Plaintiffs had originally filed a "discursive, rambling complaint with 256 paragraphs sprawling over 52 unnumbered pages" in violation of Fed.R.Civ.P. 8(a)(2)'s short-and-plain-statement rule. Subsequently, on February 9, 2001, Plaintiffs requested an extension of time until March 2, 2001 to comply with the Court's orders, which the Court granted.

On March 2, 2001, Plaintiffs requested oral argument on the orders regarding standing and the contents of Plaintiffs' complaint. One week later, on March 9, 2001, Plaintiffs withdrew their request for oral argument. On March 30, 2001, Defendants responded to Plaintiffs' submissions in compliance with the Court's orders, and on April 18, 2001, Plaintiffs replied to Defendants' response.

On April 17, 2001, Plaintiffs filed a motion requesting that the Court adjudicate Plaintiffs' request for a preliminary injunction. On April 20, 2001, Defendants filed a motion to dismiss Plaintiffs' claims. On the same day, Plaintiffs filed a motion for partial summary judgment. On April 27, 2001, Defendants filed an opposition to Plaintiffs' April 17 motion requesting adjudication of their request for a preliminary injunction. On May 2, 2001, Plaintiffs requested, and the Court later granted, an extension of time to oppose Defendants' motion to dismiss. On May 21, 2001, Plaintiffs filed their opposition to Defendants' motion to dismiss. On the same day, Plaintiffs moved the Court for leave to amend once again their amended complaint. On May 25, 2001, Defendants moved for leave to reply to Plaintiffs' opposition to Defendants' motion to dismiss. On May 31, 2001, Plaintiffs filed a motion requesting the Court to rule on Plaintiffs' request for a preliminary injunction. On

---

1. Dispositive motions still pending disposition include a motion to dismiss by Defendants, Dkt. No. 55 (filed April 20, 2001); an opposition by Plaintiffs, Dkt. No. 63 (filed May 21, 2001); a reply by Defendants, Dkt. No. 71 (filed June 8, 2001); and a motion for partial summary judgment by Plaintiffs, Dkt. No. 57 (filed April 20, 2001). Further, Plaintiffs have moved to amend their complaint, Dkt. No. 64 (filed May 21, 2001), and Defendants have filed an opposition, Dkt. No. 70 (filed June 5, 2001).

2. In the absence of the undersigned Judge, and after hearing the parties, Judge Perez Gimenez issued the Opinion and Order denying Plaintiffs' motion for a temporary restraining order. *See* Dkt. No. 7.

June 5, 2001, Defendants submitted to the Court the administrative record and filed an opposition to Plaintiffs' motion for leave to amend their amended complaint. Finally, on June 8, 2001, Defendants filed their reply to Plaintiffs' opposition to Defendants' motion to dismiss. Contrary to Plaintiffs' repeated allegations, as the record clearly shows, this case is not ripe for full adjudication on the merits, as Defendants' reply to Plaintiffs' opposition to Defendants' motion to dismiss was only filed on June 8, 2001.[3]

**Standard for Preliminary Injunction**

The standard for a Court to apply in considering a request for a preliminary injunction is well settled.

> [T]rial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir.1996) (cited in *Pharmaceutical Research and Mfrs. of America v. Concannon,* 249 F.3d 66, 2001 WL 505645 (1st Cir.2001)).

**1. Likelihood of Success on the Merits**

■ Plaintiffs anchor their claim for a preliminary injunction on two allegations of Defendants' violation of the ESA's con-

sultation requirements. First, Plaintiffs argue that the biological opinion relied upon by Defendants in conducting their training exercises was issued to Defendants by the United States Fish and Wildlife Service ("FWS") without Defendants having first submitted to the FWS the required biological assessment.

Before delving into this claim, the Court shall address the standard to be applied to the FWS' issuance of the biological opinion. Defendants allege that Plaintiffs failed to comply with the ESA's requirement that a Plaintiff provide Defendants with notice of suit 60 days before filing. Plaintiffs counter with the letter that they sent informing Defendants of their intent to sue based on Defendants' failure to prepare a biological assessment for the FWS. Because the Court finds, at least at this stage, that Plaintiffs complied with the notice requirement, the appropriate standard to apply is whether there has been a "violation" of the ESA under its citizen suit provision, 16 U.S.C. § 1540(g), rather than whether there has been "arbitrary and capricious final agency action" under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706.[4]

■ Thus, the Court must decide whether Plaintiffs are likely to succeed on the merits of a claim of a violation of the ESA's requirement of the preparation of a biological assessment before the issuance of a biological opinion. Defendants counter Plaintiffs' argument by asserting, among other things,[5] that the consultation

---

3. Further, the numerous instances of Plaintiffs' failure to comply with Fed.R.Civ.P. 8 in drafting their complaint substantially delayed the proceedings.

4. If Plaintiffs had not complied with the ESA's notice requirement, they would only be able to seek review of the FWS' issuance of the biological opinion under the highly defer-

ential "arbitrary and capricious" standard of the APA.

5. The Court restricts its consideration to the parties' properly developed arguments. Arguments that are merely "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990).

package prepared by Defendants and submitted to the FWS was an acceptable substitute for a biological assessment.

In support of this argument, Defendants point out that the purpose of a biological assessment "is to evaluate the potential effects of the action on listed or proposed species or designated or proposed critical habitat and determine whether any such species and habitat are likely to be adversely affected by the action." Further, under the relevant regulations, the contents of a biological assessment are chosen at the discretion of the agency seeking the biological opinion. *See* 50 C.F.R. § 402.12 (2001). The biological assessment, according to Defendants, need only be adequate to "serve as an analytical instrument" that can be used for analyzing the effects of the agency's action. Plaintiffs essentially agree with this characterization of the purpose of a biological assessment, but they argue that the consultation package that Defendants substituted for a biological assessment was not adequate to fulfill the purpose of a biological assessment.

In support of the sufficiency of their consultation package as a biological assessment, Defendants assert that the package (1) "evaluated the potential effects of the training activities on listed species and critical habitat and determined whether any such species and habitat were likely to be adversely affected by the action;" (2) "contained the results of the on-site inspections and monitoring of the site;" and (3) "considered the views of the [FWS'] Boqueron Field Office biologists during informal consultation with the [FWS]." Ac-

cording to Defendants, these aspects of the consultation package were "consistent with the framework in the regulations describing the recommended contents of a biological assessment. *See* 50 C.F.R. § 402.12(f)."

Plaintiffs, on the other hand, argue that Defendants' consultation package was not an adequate substitute for a biological assessment. In support of their contention. Plaintiffs assert that the consultation package does not contain "the results of on-site inspections, the views of recognized experts, a review of the literature, an analysis of the effects of the action on listed species or an analysis of alternate actions."

This assertion is inadequate to impugn the sufficiency of Defendants' consultation package for two reasons. First, the contents of a biological assessment are discretionary with the agency that prepares it; the regulation governing the contents of a biological assessment lists items that it "may" contain. *See* 50 C.F.R. § 402.12(f) (2001).[6] Second, even if the items that Plaintiffs list were required, Defendants' consultation package goes a considerable way toward satisfying those requirements. The consultation package, Dkt. No. 12, Exhibit 22, provides a list of endangered and threatened species in the training area, descriptions of the species' habitats and nesting areas, reasons for the species' decline, actions taken to protect the species, results of aerial surveys, and a list of restrictions on military exercises.

The Court finds at this preliminary stage that Plaintiffs are not likely to suc-

---

6. (f) Contents. The contents of a biological assessment are at the discretion of the Federal agency and will depend on the nature of the Federal action. The following may be considered for inclusion: (1) The results of an on-site inspection of the area affected by the action to determine if listed or proposed species are present or occur seasonally. (2) The

views of recognized experts on the species at issue. (3) A review of the literature and other information. (4) An analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies. (5) An analysis of alternate actions considered by the Federal agency for the proposed action.

ceed on the merits of a claim of a violation of the ESA's requirement of the preparation of a biological assessment. In other words, Defendants' consultation package is likely to be found to satisfy the requirement of a biological assessment.

Plaintiffs' second claim of violation of the ESA's consultation requirements is that the biological opinion issued by the FWS suffers from substantive defects that make its issuance arbitrary and capricious under the APA.[7] The Court shall address these alleged defects in turn.

First, Plaintiffs assert that the FWS' biological opinion "fails to consider several cumulative effects on the listed species," including the effects of sonar and "sonobuoys" on listed species. In response, Defendants argue that the FWS "did analyze the overall impacts to the species and the habitat." Defendants counter that the concept of "cumulative effects" refers to the effects of State or private activities in the area and that the FWS did not analyze these effects because it anticipated no such activities.

Second, Plaintiffs contend that the FWS' biological opinion failed to the effects on listed species of inert munitions "skipping" off of targets and into the water. Defendants respond that their consultation package adequately addressed skipping and that the FWS determined "that rounds skipping into the water were not likely to adversely affect any listed species."

Third, Plaintiffs claim that the biological opinion "fails to mention nighttime firing as a factor that might adversely affected listed species. The biological opinion simply states that the 'use of illumination rounds will be minimized to the extent practicable.'" Defendants reply that al-

though the biological opinion does not discuss nighttime firing at length, the consultation package on the basis of which the biological opinion was issued goes into considerable detail regarding the measures that Defendants will take to minimize the impact of nighttime firing on species in the area.

Fourth, Plaintiffs contend without support that the FWS failed to use the best available commercial and scientific data in rendering its biological opinion. Defendants counter by stating that the FWS' determinations "are based upon the best available data and consideration of relevant factors." Fifth, Plaintiffs assert that the FWS' biological opinion ignores "the potential impact that mitigation measures such as beach grading and crater filling may have on sea turtle hatchlings." Defendants respond that the biological opinion does consider these issues. The biological opinion states,

> [i]n the unlikely event that a round/bomb does hit the beach, craters and materials that may affect the ability of nesting or hatching turtles to traverse the beach will be filled and removed to ensure that neither female sea turtles or [sic] their offspring will be trapped. Additionally, any vehicle tracks/ruts running parallel to the amphibious beaches will be removed (i.e.graded) so there will be no impact to turtle hatchlings.

Dkt. No. 12, Exhibit 24. Thus, far from ignoring the effect of mitigation measures on sea turtle hatchlings, the FWS' biological opinion discusses mitigation measures as a means of protecting turtle hatchlings.

Sixth, Plaintiffs claim that the biological opinion contains insufficient discussion of

---

**7.** The Court emphasizes the distinction between a ruling on the merits and a ruling on a motion for a preliminary injunction. The issue of whether there has been arbitrary and capricious agency action will be decided on the merits on the basis of the administrative record that was just filed with the Court on June 5, 2001.

the plight of the brown pelican. Defendants retort with examples of attempts they have made to accommodate the brown pelican and point out that the biological opinion requires a 1,500–foot minimum altitude for flights, as opposed to the previous 500–foot restriction, for the protection of the brown pelican.[8]

Seventh, Plaintiffs assert that the FWS' biological opinion ignores recent literature on "marine mammal and sea turtle survey methodology." Proper consideration of this issue, Plaintiffs aver, would have made clear to the FWS that sea turtle and marine mammal survey flights could be more effectively conducted at times other than those proposed in the biological opinion. Finally, Plaintiffs state that the FWS' biological opinion fails to consider the effect of "acoustic and vibration disturbances" on sea turtles and contains "many substantive and statistical inaccuracies." Plaintiffs offer insufficient evidence in support of these last arguments.

It is far from clear, at this preliminary stage, that the FWS' biological opinion suffers from the numerous defects which Plaintiffs attribute to it, much less that these defects satisfy the exacting requirement of rendering the opinion "arbitrary and capricious." Both parties make strong arguments regarding these alleged defects that are in stark opposition. The Court is loathe to substitute its judgment for that of the FWS, especially when under the APA the actions of the FWS need only avoid being found "arbitrary and capricious."[9] *See United States v. Hernandez,* 979 F.Supp. 70, 76 (D.P.R.1997) (pointing out that "[i]f the agency considered the relevant factors and if the agency did not make a clear error of judgment, then the

decision was not arbitrary or capricious"), *aff'd,* 187 F.3d 623, 1998 WL 1085772 (1st Cir.1998). Thus, the Court finds that Plaintiffs are not likely to succeed on the merits in showing the FWS' biological opinion to be arbitrary and capricious under the APA.

## 2. Potential for Irreparable Harm

Plaintiffs argue that without a preliminary injunction they will suffer two types of irreparable harm. First, they assert that a procedural violation of the ESA's consultation requirements automatically constitutes irreparable harm. Second, they cite the potential for harm to listed species in the event that Defendants' training exercises continue. Plaintiffs state, "[t]he death of even a single member of an endangered species represents irreparable harm since it interferes with breeding opportunities and eliminates genetic material in a diminishing gene pool."

Defendants dispute that any irreparable harm would result from a continuation of their training exercises. Although some measure of irreparable harm to listed species could result from the exercises, Plaintiffs, apart from the harm that they argue is inherent in a procedural violation of the ESA's consultation requirements, point only to the "suggest[ion] that ... plants will be harmed or killed" by the exercises and the possibility that "[e]rrant bombs may injure ... marine mammals or sea turtles." Without a stronger showing, the Court can not at this stage find that Plaintiffs have demonstrated the irreparable harm necessary to entitle them to preliminary injunctive relief.

---

**8.** Plaintiffs have the burden of showing that Defendants are not complying with this requirement, and Defendants' compliance is easily verifiable.

**9.** The Court notes that the voluminous administrative record was filed with the Court on June 5, 2001.

### 3. Balance of Relevant Impositions (Equities)

At this stage, the Court must weigh the harm to Plaintiffs in the event that the Court does not grant a preliminary injunction against the harm to Defendants in the event that the Court grants a preliminary injunction. The Court can not find that this balancing of relative hardships favors Plaintiffs at this stage in the proceedings.

█ The Court has already discussed the harm to Plaintiffs that would likely result from the denial of a preliminary injunction: the potential loss of individual members of listed species and the less tangible harm presumed from a procedural violation of the ESA's consultation requirements.[10]

Defendants, on the other hand, face tangible harm of large magnitude if the Court grants a preliminary injunction. Defendants would incur tremendous costs if they were forced by a preliminary injunction to undo existing plans and preparations associated with the execution of large-scale battle-simulation exercises. In addition, Defendants' ability to place themselves in a state of military readiness would also suffer. The declaration of Admiral William J. Fallon to which the Court referred in its Opinion and Order denying a temporary restraining order in this case applies with the same force now as it did then. Admiral Fallon points out that training exercises on Vieques are "critical" to the Navy's ability to carry out its missions around the world "promptly, effectively, and as safely as possible." Further, Admiral Michael G. Mullen asserts in his declaration that Vieques is "the only location in the Atlantic where realistic, multi-dimensional combat training can be conducted in a combined and coordinated manner" and that training on Vieques "directly equates with lives saved in combat." In short, the grant of a preliminary injunction would work the irreparable harm of reducing the Navy's ability to make itself ready for combat.

Plaintiffs argue that "[t]he Court must balance the equities in favor of endangered species." They also submit a statement by Retired Vice Admiral John J. Shanahan to support the proposition that the Navy "has numerous alternatives to Vieques that satisfy the nation's national security needs." These alleged alternatives, Plaintiffs argue, minimize any harm to the Navy from a preliminary injunction of its training exercises. The Court can not simply rely on Retired Vice Admiral Shanahan's statement and ignore the statements of Admirals Fallon and Mullen. Because the parties' military experts stand in diametric opposition on this issue, Plaintiffs have failed to make a clear showing at this preliminary stage.[11]

Plaintiffs also claim that the Court should give little credence to the statements of Admirals Fallon and Mullen because their statements assume that "live ordnance fire is still allowed on Vieques." The Court finds this argument unpersuasive; although the Navy may prefer live-fire training, the Court is in no position draw the conclusion that training with inert ordnance is not useful to the Navy. Further, Plaintiffs have submitted no evidence that the Navy, who is presumably in the best position to judge its own needs, considers training with inert ordnance to be a useless exercise. Finally, Plaintiffs

---

10. Plaintiffs incorrectly assert that health effects on the residents of Vieques are a harm to be balanced in determining whether to grant a preliminary injunction under the ESA. The ESA exists to protect endangered species.

11. Retired Vice Admiral Shanahan retired from service with the Navy 24 years ago.

propose an alternative site to Vieques for the Navy's exercises: Dog Island. The parties simply disagree on the efficacy of Dog Island as an alternative to Vieques. Even if Vieques is not the most militarily useful site for the Navy's training exercises, it is not for the Court to make this judgment. The Court makes legal determinations and must leave policy decisions to the two branches of government created for dealing with such issues: the Executive and the Legislative branches. Thus, the balance of relative hardships strongly favors Defendants at this point in the proceedings.

### 4. Effect on the Public Interest

As the Court pointed out in its Opinion and Order denying Plaintiffs' motion for a temporary restraining order, the notion of public interest is an expansive one. Indeed, "[t]he Court ... must pan back and keep the larger picture in focus." Dkt. No. 7. The grant of a preliminary injunction would harm the Navy's ability to provide the national defense. This would have a large negative effect on the public interest.

On the other hand, the public clearly has an interest in the vindication of violations of its environmental laws, but the denial of a preliminary injunction at this stage of the proceedings is not likely to harm this interest. Thus, the public interest weighs in favor of denying a preliminary injunction.

The Court is mindful of the intense passions that have arisen out of the Vieques–Navy controversy. It is also cognizant, however, of its duty to follow the law, wherever it may lead, and of its duty to safeguard the basic tenet of judicial independence.

WHEREFORE, the Court having considered the four prongs of the standard for deciding a motion for a preliminary injunc-

tion, Plaintiffs' Motion for Preliminary Injunction based on the ESA's consultation requirements is hereby denied.

**It Is So Ordered.**