UNITED STATES of America,
Plaintiff,

v.

Tomas IRIZARRY, Defendant.

No. 96–2263 DRD.

United States District Court,
D. Puerto Rico.

March 31, 2000.

Edna C. Rosario–Munoz, U.S. Attorney's Office Dist. of P.R., Hato Rey, PR, for plaintiff.

Patricio Martinez–Lorenzo, Hato Rey, PR, for defendant.

### OPINION AND ORDER

DOMINGUEZ, District Judge.

The United States of America brings this action pursuant the provisions 33 USCA 403 of Section 10 of the Rivers and Harbors Act.

The government seeks injunctive relief to compel the defendant, Tomas Irizarry to remove an expansion to a previously constructed household structure. A two story wooden house and associated features including mooring pile and board built in the navigable waters of La Parguera, Lajas, Puerto Rico was added to the pre-existing "grandfathered" structure.

The Court held a two-day bench trial, the parties each had full opportunity to record pertinent evidence substantiating their respective claims.

### FINDINGS OF FACTS

Based on all the evidence and testimony presented at trial, the Court makes the following findings of fact.

1. The waters of La Parguera are navigable waters of the United States. The United States Army Corps of Engineers (ACOE) has jurisdiction over the navigable waters of the United States including

Puerto Rico (Transcript of March 14, 2000 at pages 6–8).

2. La Parguera is a natural reserve of Puerto Rico where a delicate and complicated ecosystem exists. The mangrove fringe, the yellow shouldered black bird, the thalassic seagrass beds and the bioluminescent bay are part of that natural reserve. (Transcript of March 15, 2000 at pages 61–62).

3. The defendant was the owner of a single story wooden house located on the shoreline of La Parguera. The footprint of this structure was of 30 feet by 30 feet. (Transcript March 14, 2000 at pages 18–19).

4. Defendant's wooden stilt house enjoyed the privilege of the Grandfather Status as provided by 33 CFR 330.3 and by Part 322(7) of the Federal Register. (Transcript March 14, 2000 pages 16–17).

5. On September 29, 1989 the then Secretary of the Department of Natural and Environmental Resources (DNER), Jose Laborde, ordered the defendant to remove the structure he owned in La Parguera due to the degree of deterioration of the same since the project would entail total reconstruction. (Ex. 1 at 13 and Ex. 3.)

6. The Nationwide Permit # 3 that was in effect at the time allowed the maintenance, repair, rehabilitation or replacement of any grandfathered serviceable structure authorized by 33 C.F.R. 330.3. However, if the house was not serviceable as to required reconstruction, the NWP# 3 was inapplicable.

7. On November 2, 1992, the defendant removed the Grandfathered structure and totally replaced it with a new two story wooden house without a permit from the ACOE. The defendant increased the footprint to 37 feet wide by 28 feet long and the building height from one to two stories. (The photographs presented in evidence lead the court to the conclusion that the new dwelling was a pre-fabricated type of structure. Ex. A, C, D, E, H, I, P, Q.)

The new two story house is connected to the local sewer system and does not discharge contaminants to adjacent waters.

8. On November 23, 1993, the defendant was notified with a Cease and Desist Order from ACOE. (Ex. 1 at 39–34.) The Order commanded the defendant to voluntarily restore the area of the unauthorized work in accordance with a mutually agreed plan with ACOE.

9. On December 10, 1993, defendant, Tomas Irizarry, acknowledged receipt of the Cease and Desist Order. In that letter, defendant admitted that he "replaced a wooden house with another" and informed ACOE that he would comply with the Cease and Desist Order. (Ex. 1 at 40.)

10. Since the defendant failed to comply with the Cease and Desist Order, ACOE provided in writing (Ex. 1 at 45–46) the defendant with two (2) alternatives to resolve the enforcement case:

1. The total removal of the deposited fill and reconstruction of the house to its original foot print;

2. The submittal of an After the Fact Permit Application to try to legalize the new house and the deposited fill.

11. On January 28, 1994, the defendant filed for an After–The–Fact Permit "to legalize a[new] wooden house in Parguera." (Ex. 1 at 47–55.)

12. On March 16, 1994, ACOE issued a Public Notice required for the process of the After the Fact Permit. The Notice announced the project and invited interested parties to provide comments. Citizens, federal and state agencies were invited to reply. (Ex. 1 at 26–30.)

13. The Environmental Protection Agency (EPA), the Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) strongly opposed the legalization of the unauthorized structure and recommended the denial of the project. (See Ex. 1 at 96–97; 98–99; 100–10.)

14. On August 2, 1994, ACOE again wrote a letter to the defendant. (Ex. 1 at 104–105.) In said letter the defendant was provided with the comments received by the agencies in response to the public notice. The letter also requested further information from the defendant and notified him that the Grandfathered status of the previous structure had been revoked because the existing structure had been substituted by a new construction. Defendant's application was held in abeyance for 30 days pending the receipt of his response.

15. On August 16, 1994, the defendant had a meeting at the ACOE's offices. The defendant was then informed that ACOE was willing to consider the reduction of the footprint of the unauthorized structure and restoration of the mangrove area behind the house. (Ex. 1 at 107.) The defendant was to submit plans and ACOE was to initiate Section 7 consultation.

16. The letter of August 16, 1994 made no reference nor suggested that the defendant could return to the Grandfathered Status enjoyed by the previous structure.

17. Pursuant to 15 CFR 930, the permitting process to legalize the new structure requires that the applicant, the defendant, obtain a certificate of consistency with the Puerto Rico Coastal Zone Management Plan (CZM).

18. Pursuant to 15 CFR 930, the CZM is a program implemented by the Puerto Rico Planning Board (PRPB).

19. On September 16, 1994, Norma E. Burgos, Chairwoman for the PRPB, wrote a letter to the defendant (Ex. 1 at 111–112) wherein he was advised that the PRPB objected to the project for insufficient information to determine the consistency of the activity with the CZM.[1] The defendant was advised of his right to appeal the PRPB's decision to the U.S. Department of Commerce, pursuant to 15 CFR Part 930; no appeal pursuant to 33 CFR 320.4(h) was taken.

20. ACOE is prohibited from issuing a permit when the certificate for CZM has been denied by the PRPB. Pursuant to 33 CFR 320.4(h) the only action that ACOE can take is deny the permit.

21. On January 5, 1996, the defendant was informed that his permit had been denied since the project did not comply with the Guidelines of the Clean Water Act and was found to be contrary to the public interest. (Ex. 1 at 126–145.) The permit was further denied because the PRPB denied the CZM certification and ACOE regulations mandate the non issuance of a permit in the absence of the CZM.

22. The record is devoid of any evidence that the defendant submitted any plans to reduce the footprint of the existing structure or to restore the area.

23. On November 24, 1998, the defendant filed at the ACOE a second permit application to remove possible obstruction to navigation and reduce the then current footprint to the prior structure's dimensions. ACOE and the PRPB did not accept this second permit application because plaintiff had then refused to remove the illegal structure and litigation was pending. (Ex. 1 at 181–191.)

## STANDARD OF REVIEW

In reviewing ACOE's decision the Court has to look into the record the agency developed at the time and determine whether the decision was "rational" and not arbitrary and capricious based on that record.

> The reviewing court may not compensate for agency deficiencies; it may not provide a basis for the agency's decision that the agency itself did not give. Id. Although this standard of review is a narrow one, the court must make a through review and a careful inquiry

---

1. The Puerto Rico Planning Board "object[ed] the project for insufficient information which is necessary to determine the consistency of the activity with the ... Puerto Rico Coastal Management Program."

into the record. *Dubois,* 102 F.3d at 1285. An agency decision will pass muster if the court determines that the decision makes sense. *Id. United States v. Pablo Hernandez,* 979 F.Supp. 70–77 (D.P.R.1997).

The First Circuit of Appeals has consistently held that "the ultimate standard of review is a narrow one."

To determine whether the Corps' decision complies with the arbitrary and capricious standard, we consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the [Corps]. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). *See also United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985) ("An agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress"); *All Regions Chemical Labs, Inc. v. U.S. E.P.A.,* 932 F.2d 73, 75 (1st Cir.1991) ("In reviewing EPA's decision we must pay particular attention to the interpretation that it gives its own rules and regulations"); *Environmental Coalition of Broward County, Inc. v. Myers,* 831 F.2d 984, 986 (11th Cir.1987) (deference to the Corps' determination is "particularly appropriate in the case of complex environmental statutes such as the Clean Water Act".) *Town of Norfolk v. U.S. Army Corps of Engineers,* 968 F.2d 1438, 1445–46 (1st Cir.1992).

Recently in *Penobscot Air Servs. v. F.A.A.,* 164 F.3d 713, 720 (1st Cir.1999) the court reiterated the standard.

Although "the ultimate standard of review is a narrow one," the court must undertake "a thorough, probing, in-depth review" and a "searching and careful" inquiry into the record. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In order for an agency decision to pass muster under the APA's "arbitrary and capricious" test, the reviewing court must determine that the decision is "rational," *Citizens Awareness Network,* 59 F.3d at 290, that it "make[s] ... sense," *Puerto Rico Sun Oil,* 8 F.3d at 77. Only by "carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision" can the court "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (internal quotation marks omitted).

█ Finally, when a District Court examines an agency decision under the arbitrary and capricious standard, it must determine "whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elec. v. Natural Resources Defense Council,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983). Should the agency have considered the relevant factors and should the agency have not made a clear error in judgment, then the decision may not be cataloged by the reviewing court as arbitrary nor capricious. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *Dubois v. United States Dept. of Agriculture,* 102 F.3d 1273, 1285 (1st Cir.1996); *United States v. Hernández,* 979 F.Supp. 70, 76 (D.P.R.1997).

Finally, although the standard is highly differential, "it is not a rubber stamp." *Dubois v. United States Dept. of Agriculture,* 102 F.3d 1273, 1285 (1st Cir.1996).

### APPLICABLE LAW

Section 10 of the Rivers and Harbors Act (RHA), 33 USCA. 403 "was enacted to

preserve and protect the country's navigable waterways", *United States v. Pablo Hernandez, Id.* at 76. The Clean Water Act (CWA) or Section 404, was enacted to protect the chemical, biological and physical integrity of the waters of the United States, 33 USCA 1344. The ACOE has the responsibility of administering the RHA and the permit program for the deposit fill or dredge material pursuant Section 404 of the CWA.

Section 10 of the RHA has three clauses. The first clause refers to the creation of the navigable capacity of the United States Waters. 33 USCA § 403; *United States v. Boyden*, 696 F.2d 685, 687 (9th Cir.1983); *United States v. Pablo Hernandez*, 979 F.Supp. at 76. This section has its foundation in history, as the waterways were the highways in which both commerce and armed forces could navigate through the young nation, the United States during the 18th and 19th century, and any obstruction in those waters either purposely or negligently created would impair the use of said waterways for the purposes stated, giving rise to an action by the United States to remove the obstruction.

The second clause specifically regulates construction in navigable waters of the United States and enumerates a series of regulated activities. The clause lists structures that may be built in the United States waterways only with authorization from the ACOE. *United States v. Pablo Hernandez, Id.* at 76. This clause also maintains what are "obstructions" and determines that "obstructions" are to be defined by ACOE. *Id.*

The third clause regulates the deposit of dredged or fill material presently covered by the CWA. *United States v. Republic Steel Corp.*, 362 U.S. 482, 486–487, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). The ACOE issues under the second and third clause construction permits over the covered waters within its jurisdiction. The statutory relationship is apparent, a permit exists for a structure; a structure exists because of a permit. It is a symbiotic relationship, in which one does not subsist absent the other.

The permitting process applicable to the case at hand is regulated by 33 CFR 320 through 330. 33 CFR 325 of the regulation provides for the Individual permits, the Letters of permission, the General permits, Nationwide permits, Programmatic permits and Section 9 permits.

In section 325.1 through section 325.9, the permitting scheme is established and detailed. Section 325.2 sets forth the standard procedure for the processing of applications. These include the CZM certificate, 325.2(b)(2)(i), the public notice 325.3, the forms of permits 325.5 and the modification, suspension or revocation of permits 325.7.

This last part established "the basic timing sequence used by the Corps of Engineers in processing application for DA permits." 325.1(a). Separate from this section there are special procedures and one of these special procedures is the Nationwide Permits (NWP).

Section 325.6(2) states that the NWP's are regulated by 33 CFR 330.

(2) *Nationwide permits.* Nationwide permits are a type of general permit and represent DA authorizations that have been issued by the regulation (33 CFR part 330) for certain specified activities nationwide. If certain conditions are met, the specified activities can take place without the need for an individual or regional permit.

Through 33 CFR 330 the ACOE developed the NWP program. The purpose of this NWP program is described in 330.1:

§ 330.1 Purpose and policy.

(a) *Purpose.* This part describes the policy and procedures used in the Department of the Army's nationwide permit program to issue, modify, suspend, or revoke nationwide permits; to identify conditions, limitations, and restrictions on the nationwide permits; and, to iden-

tify any procedures, whether required or optional, for authorization by nationwide permits.

(b) *Nationwide permits.* Nationwide permits (NWP's) are a type of general permit issued by the Chief of Engineers and are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts. The NWP's are proposed, issued, modified, reissued (extended), and revoked from time to time after an opportunity for public notice and comment. Proposed NWP's or modifications to or reissuance of existing NWP's will be adopted only after the Corps gives notice and allows the public an opportunity to comment on and request a public hearing regarding the proposals. The Corps will give full consideration to all comments received prior to reaching a final decision.

(c) *Terms and conditions.* An activity is authorized under an NWP only if that activity and the permittee satisfy all of the NWP's terms and conditions. Activities that do not qualify for authorization under an NWP still may be authorized by an individual or regional general permits. The Corps will consider unauthorized any activity requiring Corps authorization if that activity is under construction or completed and does not comply with all of the terms and conditions of an NWP, regional general permit, or an individual permit. The Corps will evaluate unauthorized activities for enforcement action under 33 CFR part 326. The district engineer (DE) may elect to suspend enforcement proceedings if the permittee modifies his project to comply with an NWP or a regional general permit. After considering whether a violation was knowing or intentional, and other indications of the need for a penalty, the DE can elect to terminate an enforcement proceeding with an after-the-fact authorization under an NWP, if all terms and conditions of the NWP have been satisfied, either before or after the activity has been accomplished.

(d) *Discretionary authority.* Districts and division engineers have been delegated a discretionary authority to suspend, modify, or revoke authorizations under an NWP. This discretionary authority may be used by district and division engineers only to further condition or restrict the applicability of an NWP for cases where they have concerns for the aquatic environment under the Clean Water Act section 404(b)(1) Guidelines or for any factor of the public interest. Because of the nature of most activities authorized by NWP, district and division engineers will not have to review every such activity to decide whether to exercise discretionary authority. The terms and conditions of certain NWP's require the DE to review the proposed activity before the NWP authorized its construction.

(e)

(2)

(3)

(f)

(g)

Within this context this Court must then examine the "grandfathering" authorized as to structures completed before December 18, 1968 over covered waters.

In 33 CFR 330.3 the ACOE started regulating activities that had occurred before certain dates. To that effect the regulation states the following:

The following activities were permitted by NWP's issued on July 19, 1977, and, unless the activities are modified, they do not require further permitting.

(a)

(b) Structures or work completed before December 18, 1968, or in water bodies over which the DE had not asserted jurisdiction at the time the activity occurred, provided in both instances, there is no interference with navigation. Activities completed shoreward of applicable Federal Harbor lines before May 27,

1970 do not require specific authorization. (Section 10).

The above regulation is the Grandfather clause which administratively authorized "certain types of activities performed in navigable waters and exempted other altogether from the need to obtain Section 10 permits" provided that they maintained the original footprint and purpose. *Federal Register, Department of Defense, Rules and Regulations,* part 322 of July 19, 1977. The Grandfather regulation must then be analyzed closely with the NWP # 3. This NWP # 3 is registered at the Federal Register, Volume 56, No. 226 of November 22, 1991, 33 CFR 330, APP.A # 3. The regulation reads as follows:

3. *Maintenance.* The repair, rehabilitation, or replacement, or replacement of any previously authorized, currently serviceable, structure or fill, or of any currently serviceable structure or fill authorized by 33 CFR 330.3, provided that the structure or fill is not to be put to uses differing from those uses specified or contemplated for it in the original permit or the most recently authorized modification. Minor deviations in the structure's configuration or filled area including those due to changes in materials, construction techniques, or current construction codes or safety standards which are necessary to make repair, rehabilitation, or replacement are permitted, provided the environmental impacts resulting from such repair, rehabilitation, or replacement are minimal. Currently serviceable means useable as is or with some maintenance, but not so degraded as to essentially require reconstruction. This nationwide permit authorizes the repair, rehabilitation, or replacement of those structures destroyed by storms, floods, fire or other discrete events, provided the repair, rehabilitation, or replacement is commenced or under contract to commence within two years of the date of their destruction or damage. In cases of catastrophic events such as hurricanes or tornadoes, this two-year limit may be waived by the District Engineer, provided the permittee can demonstrate funding, contract or other similar delays. Maintenance dredging and beach restoration are not authorized by this nationwide permit. (Section 10 and 404).

### *The Phoenix*

This Court has characterized the issue in the instant case as to whether the "Phoenix can rise again from its ashes." An analysis of the aforecited applicable laws lead this Court to conclude that the "Phoenix can't rise again from its ashes."

The United States has proved by a preponderance of the evidence that the defendant was the owner of a Grandfathered single story wood house built on navigable waters of the United States before December 18, 1968. That wooden house was permitted by a NWP issued on July 19, 1977, since it was a structure completed before December 18, 1968, 330 CFR 330.3. Defendant's wooden house was subject to the provisions and restrictions of NWP # 3, 33 CFR 330 App.A., which authorized him to repair rehabilitate or replace any previously authorized, currently serviceable structure. The CFR furthers defines serviceable as "usable as is or with some maintenance, but not so degraded as to essentially require reconstruction."

The evidence submitted by the United States proves that defendant's vacation house had been ordered by the Secretary of Natural Resources to be removed from La Parguera due to the degree of deterioration that would require reconstruction of the same as early as September 29, 1989. Therefore, it is conclusive that by November 2, 1992, defendant's house was not serviceable as regulated by NWP # 3.

Further, on August 9, 1992, that is three months before the total removal of the house, defendant was intervened by officers of the DNER because the defendant was replacing, without proper authorization, the complete floor of the structure. (See Exhibit 3).

At that historical moment the defendant had two alternatives: the removal of the house from the navigable waters or the filing of an individual permit application at ACOE, for that structure as of that moment did not satisfy all of the NWP # 3 terms and conditions. 33 CFR 330.1(c).

The defendant chose none and prompted by the extent of the deterioration of the Grandfathered house, after being ordered to remove the same and after not obtaining the required permits from the DNER, took it upon himself to totally remove the Grandfathered house. On November 2, 1992, defendant's agents entered La Parguera with a pre-fabricated wooden structure and placed the same where the Grandfathered structure used to be. (See photograph of the new structure both at its pre-fabricated building stage and final stage, Ex. A, C, D, E, H, I, P, Q.) By November 5, 1992 there was in place a two-story wooden house with different dimensions than those of the Grandfathered structure and constructed slightly to the east of the original property.

■ The defendant argues to this Court that the ACOE should allow him to return to the Grandfather status because the ACOE acted ultra vires when it revoked the Grandfather status. To try to establish this defense the defendant relies to 33 CFR 325.7. The court finds this argument deficient. As the Court reviewed applicable statutes it is clear that 33 CFR 325.7 does not apply to NWP's. In fact section 325.5(2) specifically refers the NWP's to section 330 which is the section that completely regulates the NWP program. Therefore, the process of modification, suspension or revocation of permits as detailed in section 325.7 did not apply to defendant's Grandfathered structure.

■ The NWP Program dictates its own authority to suspend, modify or revoke authorizations under an NWP. Section 330.1(d) reads as follows:

(d) *Discretionary authority.* District and division engineers have been delegated a discretionary authority to suspend, modify, or revoke authorizations under an NWP. This discretionary authority may be used by district and division engineers only to *further condition or restrict the applicability of an NWP for cases where they have concerns for the aquatic environment* under the Clean Water Act section 404(b)(1) Guidelines or for any factor of the public interest. Because of the nature of most activities authorized by NWP, district and division engineers will not have to review every such activity to decide whether to exercise discretionary authority. The terms and conditions of certain NWP's require the DE to review the proposed activity before the NWP authorizes its construction. *However, the DE has the discretionary authority to review any activity authorized by NWP to determine whether the activity complies with the NWP. If the DE finds that the proposed activity would have more than minimal individual or cumulative net adverse effects on the environment or otherwise may be contrary to the public interest, he shall modify the NWP authorization to reduce or eliminate those adverse effects, or he shall instruct the prospective permittee to apply for a regional general permit or an individual permit.* Discretionary authority is also discussed at 33 CFR 330.4(e) and 330.5. (Emphasis Added).

Under its discretionary authority the ACOE notified the defendant that his Grandfathered status had been revoked, but the notification at the time it was made was moot for the defendant had already removed the Grandfathered structure, therefore de facto there was then no grandfathered structure present to amend, suspend or revoke. If the structure no longer existed, defendant can hardly argue that the protection of the NWP persists.

■ The Court as a corollary to its Phoenix characterization now decides that the ACOE did not act Ultra Vires.

■ It was not the ACOE who dismantled the grandfathered structure the night of November 2, 1992, but the defendant acting on his own free volition. Since the structure no longer existed, by action of defendant himself, the grandfather protection disappeared and ceased to exist, along with it the right to repair, rehabilitate and maintain the same; ergo, "the Phoenix cannot rise from its ashes." [2]

### *The After–The–Fact Permit*

On November 2, 1992, a new two-story wooden house emerged on the waters of La Parguera. The ACOE, after a site inspection initiated administrative proceedings and on November 23, 1993, notified the defendant with a Cease and Desist Order. The Order granted the defendant the opportunity to restore "the area of unauthorized work in accordance with a mutually agreed plan."

On December 10, 1993, the defendant acknowledged receipt of the Cease and Desist Order of November 23, 1993, and admitted that he "replaced a wooden house with another." The letter also stated compliance with the Cease and Desist Order would follow.

Since the defendant did not comply with the Cease and Desist Order, on January 14, 1994, the ACOE provided the defendant with two alternatives:

(1) the total removal of the deposited fill and reconstruction of the house to its original footprint.

(2) the submittal of an After–The–Fact permit application to try to legalize the structure.

On January 28, 1994, the defendant chose to file an After–The–Fact Permit to legalize the new wooden prefabricated structure.

A Public Notice was issued in accordance with ACOE's regulations. All commenting agencies strongly opposed the project.

On August 4, 1994, the defendant was notified with copies of the comments received and in that same letter the ACOE requested from the defendant to supply further information. The defendant did not answer the letter notwithstanding that he met with the ACOE.

The meeting was held on August 16, 1994. As a result of the meeting the ACOE informed the defendant that they were willing to consider the reduction of the footprint of the unauthorized structure and the restoration of the mangrove area behind the house. Defendant agreed to submit plans. The defendant did not submit the plans and a month thereafter, on September 16, 1994, the PRPB denied the CZM certificate.

On January 5, 1996, the ACOE denied the After–the–Fact Permit.

■ The Court now concludes that the matter ended right there. As a consequence, the Court acknowledges that the defendant's failure to overcome the absence of a CZM certification and its failure to appeal the PRPB denial is fatal and determines unfavorably against plaintiff's equitable request to have the new structure remain in the waters of La Parguera.

The ACOE cannot issue a permit under Section 10 of the RHA unless the PRPB certifies that the activity complies with the CZM program.

Applications for DA permits for activities affecting the coastal zones of those states having a coastal zone management program approved by the Secre-

---

2. Defendant insists on "some kind of hearing" pursuant to the case of *Memphis Light Gas and Water Division v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), prior to final deprivation of property. *Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420, (1981). (Cases cited by de-

fendant.) He is seeking due process as if the state had somehow deprived him of the property. But it was plaintiff himself who destroyed the granfathered property and substituted the same with a pre-fabricated two story dwelling.

tary of Commerce will be evaluated with respect to compliance with that program. No permit will be issued to a non-federal applicant until certification has been provided that the proposed activity complies with the coastal zone management program and the appropriate state agency has concurred with the certification or has waived its right to do so. However, a permit may be issued to a non-federal applicant if the Secretary of Commerce, on his own initiative or upon appeal by the applicant, finds that the proposed activity is consistent with the objectives of the Coastal Zone Management Act of 1972 or is otherwise necessary in the interest of national security. Federal agency and Indian tribe applicants for DA permits are responsible for complying with the Coastal Zone Management Act's directives for assuring that their activities directly affecting the coastal zone are consistent to the maximum extent practicable, with approved state coastal zone management programs. 33 CFR 320.4(h) Also: 33 CFR 325.2(b)(2)(i).

Bretheren Chief Judge Laffitte of this District in *United States v. Hernandez*, 979 F.Supp. at 78 has clearly sustained the mandatory need of the CZM certificate under Section 10 as a requisite to a permit.

A permit may not be issued to an applicant unless the appropriate state agency certifies that the applicant's activity complies with the coastal zone management program. Id. § 320.4(h); see id. § 326.3(e)(1)(iii) (An after-the-fact permit must be denied when a federal, state or local agency has already denied a certificate or authorization to the applicant).

**3.** See transcript of 15 March 2000 wherein defendant's expert admits that the mangrove is to have less space to grow if all grandfathered dwellings increases their footprint (p. 36) and the underwater vegetation including the thalassia (seagrasses) is directly affected by a larger footprint (p. 42):

Defendant argues that the new property in reality does not affect any seagrass beds notwithstanding that the structure's shadow is unquestionably larger. Further, defendant avers, also through the testimony of its expert witness Dra. Graciela Ramírez, that the structure has not had any significant impact on the adjacent mangrove fringe and has not limited or affected its growth. Further, the defendant avers, the two story structure does not pose any threat to the species protected by the Endangered Species Act. The defendant further alleges that no scientific studies were performed by any of the negative community federal agencies, their conclusions being made exclusively upon observation.

Defendant, however, misses the mark. The United States may simply deny authority to build any new structure simply because the new structure is larger than the "grandfathered" dwelling in a location subject to navigable water jurisdiction, in a natural reserve of Puerto Rico where a delicate and complicated ecosystem exists. The opposite result, allowing all grandfathered structures to unilaterally increase their respective footprint, would simply constitute outright chaos at La Parguera. Further, mangroves although not totally affected are nevertheless obstructed in its natural growth and a larger structure through its permanent shadow affects and kills underwater vegetation.[3] Hence, the decision of the ACOE is not arbitrary and capricious because "relevant factors" were considered and the court further does not detect any error in judgment. The decision is, hence, "rational" and constitutes a "reasoned decision." *Penobscot Air Services v. FAA*, 164 F.3d at 720; *Town of*

The Court: But it would, however, kill [vegetation] in the specific area where the footprint is increased.
The witness: Yes.
Further photograph "N" depicts the manner by which mangrove's growth is obstructed and affected in its natural growth by a larger footprint construction.

*Norfolk v. U.S. Army Corp. of Engineers,*
968 F.2d 1438, 1445–1446 (1st Cir.1992).[4]

WHEREFORE, the Court hereby **GRANTS** the United States request for injunctive relief and **ORDERS** the defendant to remove the two story wooden house from the navigable waters of the United States.

The defendant will comply with this **ORDER** in **thirty (30)** days after entry of the Judgment in docket.

IT IS SO ORDERED.

4. One final word is pertinent. Although the court does not have before it the request of plaintiff as to the second "after the fact permit" reducing the footprint of the two story dwelling to its original one story dimension of 900 square feet, denied by ACOE intitially because of the instant litigation, the matter after compliance with the judgment issued herein, should no longer be barred by the instant litigation and is to be considered by all pertinent authorities in a neutral non vindictive fashion. This court does not hint as to any ultimate outcome and, of course, the court is not legally empowered to issue any permits because the permitting procedure belongs in first instance to the administrative agencies. Notwithstanding, the court notes from the record in this case that the grandfathered property was located immediately next to a commercial marina where gasoline and oil products are sold. Mangroves will not be further affected on a construction producing identical shadow and having the same footprint as the original grandfathered structure; seagrass will also not be further affected by a structure of identically footprint as the original and no Endangered Species seem to be currently affected. The court is conscious notwithstanding that other factors may be developed at the administrative level further enhancing or diminishing the issuance of a permit.